STATE OF VERMONT

ENVIRONMENTAL COURT

Appeal of Sunset Cliff, Inc.[1]    }
                              }
                              }   Docket No. 26-2-01 Vtec
                              }
                              }

Decision and Order

Appellant Sunset Cliff, Inc. appealed from a decision of the Development Review Board (DRB) of the City of Burlington granting final plat approval to Appellee-Applicant Keystone Development Corp. for construction of a planned residential development described in the DRB decision as A Scarlet Circle@ but described on the plans submitted in evidence as A Appletree Terrace.@ Appellant Sunset Cliff, Inc. (Sunset Cliff) is represented by Liam L. Murphy, Esq. and Lisa B. Shelkrot, Esq.; Appellee-Applicant Keystone Development Corp. (Keystone) is represented by Vincent A. Paradis, Esq.; and the City is represented by Kimberlee J. Sturtevant, Esq.

The proposed Planned Residential Development must comply with the City= s Zoning Ordinance, and in particular Article 5 (Use and Dimensional Requirements), Article 6 (Design Review), Article 7 (Site Plan Review, which allows the substitution of appropriate design review criteria in ' 7.1.7), Article 10 (Parking), Article 11 (Planned Residential Developments) and Article 14 (Inclusionary Zoning); must comply with the City= s Subdivision Ordinance; and, to the extent these two ordinances require it, must conform to the Municipal Development Plan. All section number references are to the Zoning Ordinance except those shown as ' 28-#, which refer to the Subdivision Regulations.

In a summary judgment decision on November 13, 2001 the Court ruled on Appellant= s argument that the DRB decision represented an unlawful subdelegation (to various City departments) of the DRB= s authority. The Court agreed with Appellants, but explained that as this appeal is de novo, the remedy was not to remand the matter to the DRB but for the Court to address those requested conditions anew. Appellant has raised the matter again in its requests for findings and it is again denied, for the reasons explained in the November 13, 2001 summary judgment decision.

An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge, who also took a site visit with the parties. The parties were given the opportunity to submit written requests for findings and memoranda of law. Upon consideration of the evidence, the site visit, and the written memoranda and proposed findings, the Court finds and concludes as follows.

Appellee-Applicant proposes to construct a planned residential development (PRD) to be operated as a condominium. Appellee-Applicant may sell some units and may retain ownership of other units and rent them to tenants. The proposed PRD consists of 148 residential units in 33 detached structures on a 40.9-acre parcel of land in the City= s waterfront residential low density (WRL) zoning district. A PRD is a permitted use in this zoning district. The plans for the proposed PRD were admitted in evidence, with revisions made during the hearing and commitments made by Appellee-Applicant of its willingness to incorporate the conditions imposed by the DRB within its revised application.

The parcel is owned by the Estate of John J. Flynn, of which the Chittenden Bank is trustee. Keystone is a Vermont corporation owned and controlled by Edward B. von Turkovich and Francis J. von Turkovich. The parcel is leased to Eastern Landshares, Inc., a corporation also related to the principals of Keystone, under a 99-year lease with a remaining term of approximately 82 years, expiring in 2085. A representative of the Chittenden Bank signed at the foot of the zoning permit application as > landowner= , but the > property owner= and > applicant= are both shown on the application as > Keystone Development Corporation,= and the Zoning Permit was issued by the City only to A Keystone Development Corporation.@ We note that any permit issuing for this project must be applied for by and issued to the Estate of John J. Flynn (Chittenden Bank, trustee) as well as by and to both Keystone and Eastern Landshares, Inc., as all three entities are applicants and must be bound by aspects of the permit decision. Appellee-Applicant= s principals may amend the application to add Eastern Landshares as an applicant, if they wish to correct this deficiency in the application, and may wish to verify the understanding of the trustee of the Flynn Estate, as to the legal effect of its having signed the application.

Approximately two-thirds of the parcel is wooded, and even under Appellee-Applicant= s determination of the wetlands boundaries, at least half of the acreage of the parcel consists of class III wetlands of several different types. It is a good candidate for consideration as a PRD under Article 11, due to the serious site difficulties of conventional development of the parcel. It is important to understand that the property has become wetter in the last 15 years since it was first studied for its development potential, due to the discontinuance and deterioration of the drainage ditches that allowed the former agricultural use of the property as a farm field for hay or pasture. For this reason, the Court has given greater weight to more recent wetlands observations. The Court has also given more weight to the delineation in the northerly edge of the red maple/skunk cabbage wetland done by Appellant= s expert in preparation for her testimony in this case, as compared with that done in 1987-88, 1991 and 1997 for Appellee-Applicant, both due to the passage of time during which the area has become wetter and due to methodological errors in the earlier work.

If considered roughly in four quadrants, the northwest quadrant of the property is generally a former open farm field beginning to grow up to woody shrub vegetation, with denser hydric soils than the rest of the parcel. It is bordered by a band of larger older trees along its boundary with Starr Farm Road, which are not proposed to be disturbed for the proposed PRD. The wetlands type is an ash/dogwood shrub-scrub wetland. The Court accepts Appellee-Applicant= s delineation of the wetlands boundary in this quadrant, as of the time of the application, although the area is becoming wetter and would if undisturbed over time probably fill in with additional

areas of wetland, leaving hummocks of upland as shown by Appellant= s delineation in this area. The northwest quadrant wetland is relatively recent and does not provide unusually significant functions and values.

The northeast quadrant of the property contains a grove of large older pine trees and other large trees, on somewhat sandy soils. Both southerly quadrants of the property tend to be wet and are not generally proposed for development. The southeast quadrant contains a red maple/skunk cabbage swamp, on unusually sandy soils for a wetland and especially for a swamp. The southwest quadrant contains an alder wetland. The parcel as a whole slopes generally gently down from its northeast to its southwest corners, but a drainage divide runs roughly diagonally from the northeast to the southwest, so that areas to the north and west of that divide drain generally to the west and south towards the westerly boundary and southwesterly corner of the property, while areas to the south and east of that divide drain generally to the south and west through the red maple/skunk cabbage swamp towards the southerly boundary and southwesterly corner of the property.

The red maple/skunk cabbage swamp is an unusually rare and significant natural area, because this plant community is rarely found in association with these sandy soils. To maintain such a community over the time necessary for the large red maples to develop as they have, the water table has stayed relatively high on a sustained basis, even when the farm field was drained and used for hay and pasture. This wetland would probably qualify for reclassification to a higher level of protection under the state system. The fact that it is now classified as Class III only means that no such petition has been filed or acted on.[2] The proposed PRD as designed encroaches on the northerly limits of this wetland and will result in the removal of some large maples at the edge of this wetland.

The parcel is bounded on the south by the rear yards of houses in the Strathmore development, on the east by the rear yards of houses along the west side of Curtis Avenue, on the north by Sunset Cliff Road, a private road providing access to the houses in the Sunset Cliff development, and on the west by vacant land owned by Sunset Cliff, Inc. and by the rear yards of houses in the Strathmore development. Land associated with the Starr Farm Beach Association is located across Sunset Cliff Road to the north. The area of the site proposed for development contains no prehistoric, native American, or historic sites.

Nineteen lakefront houses belong to Sunset Cliff, Inc. These single-family houses are individually designed and are located along the lake shore, on the westerly side of Sunset Cliff Road. Each of these properties also has a share in the common land on the southeast side of Sunset Cliff Road, which common land borders the western edge of the proposed project. The Strathmore and Curtis Road developments consist generally of single-family homes and garages on individual lots, with a mix of some duplex and some four-unit buildings, but no six-unit buildings. South of the recreation field to the south of the proposed PRD is located a townhome development of multiple-unit buildings, within the general Appletree Point area but not in the immediate neighborhood of the proposed PRD. Another development located more remotely, northeast of the open land across Sunset Cliff and Starr Farm Roads from the proposed PRD, contains multiple buildings of multi-family housing, but is not in the neighborhood of the proposed PRD.

There is sufficient municipal water and sewer capacity to serve the proposed PRD, with access for the proposed PRD to existing water and sewer mains. The proposed PRD will also be served by natural gas from Vermont Gas, electricity from the Burlington Electric Department, private solid waste hauling services, and City police and fire protection. All these services have adequate capacity to serve the proposed PRD. The City=s elementary schools, middle schools and high school that would serve the children living at the proposed PRD have sufficient capacity to serve the needs of the project. Appellee-Applicant will be responsible to pay the appropriate impact fees attributable to the proposed PRD=s impact on the school system.

The private portion of Sunset Cliff Road extends generally westward from Starr Farm Road near its intersection with Curtis Road. Applicant proposes to upgrade Sunset Cliff Road from the westerly intersection of Curtis Avenue and Starr Farm Road the short distance to the entrance to the development. Access to the interior of the proposed PRD is by a short spur from the entrance to a D-shaped roadway within the PRD known as Scarlet[3] Circle, from which the roadway of Nottingham Lane within the PRD extends in a shallow S-curve to join the end of the existing Nottingham Lane, a 30-foot-wide public road, in the Strathmore development.

The percentage of the entire 40.9-acre lot proposed to be covered by buildings, as calculated by Appellee-Applicant, is 5.6%, and the additional lot coverage of pavement, including the roadways, as calculated by Appellee-Applicant, is 9.1%. The maximum allowable coverage in this district is 35%. Appellants argue that the required lot coverage should be calculated as a percentage of the buildable area of the lot, not the total area of the lot. While the regulations of some municipalities make such a distinction in calculating the number of allowable units in a PRD, that is not how lot coverage or density is calculated under the Burlington Zoning Ordinance. The proposed PRD meets the Article 5 Use and Dimensional Requirements, including those for coverage and density.

Edinborough Park, a city park, adjoins the proposed PRD on its southerly side, and has access from the proposed PRD by a foot path through the alder wetland in the southwest quadrant of Appellee-Applicant=s parcel. To the east of and across Starr Farm Road from the proposed PRD is a large park dedicated to the City by the Flynn Estate approximately 10 years earlier in connection with earlier proposals for the development of this parcel. Other areas of open space surround the proposed PRD parcel, including Appellant=s common land directly to its west, and other land of the Starr Farm Camp Owners= association directly across Sunset Cliff Road. The bulk of the southern half of the proposed PRD will also remain undeveloped due to its wetland status. Accordingly, the proposed PRD meets the open space and park and recreation needs criteria of '6.1.10 (c) of the Design Review and Site Plan Review criteria and of '28-7(a)(K) of the Subdivision Regulations.

Appellee-Applicant proposes all 148 residential units as two-bedroom units, each 1000 square feet in area and each with a patio or deck, a garage space, an outdoor storage closet, access to trash storage areas located in the parking areas or structures near the buildings, and direct access through a front door to the outside. They are proposed in three types of buildings: nine duplex buildings each 30 feet in height, seven 4-unit buildings each 28 feet in height, and seventeen 6-unit buildings each just under 35 feet in height. All the buildings are proposed to comply with all applicable state and local building codes and with the recommended state energy efficiency

design practices. The buildings are all proposed to have a 15' front setback, 20' side setbacks, and 75' rear setbacks, and meet the dimensional requirements of the Zoning Ordinance. Appellee-Applicant has provided addresses for the units in compliance with the requirements of the Emergency-911 numbering system; those addresses have been approved by the City and meet the requirements of ' 28-7(b)(7)(B) of the Subdivision Regulations.

Eight of the duplex buildings are proposed along the portion of Scarlet Circle whose rear yards will back up to the rear yards of the Curtis Avenue houses; the remaining duplex building is proposed as the last building along Nottingham Lane adjacent to the Strathmore development. The six-unit buildings are all proposed to be located more centrally within the proposed PRD. The proposed buildings and their accessory garage/storage buildings relate harmoniously to the use, scale and architecture of the buildings in the Curtis Road and Strathmore areas, in that they are residential, are sited along and close to the street, and are of a massing or scale compatible with the buildings in the surrounding areas in height and volume. Even though the six-unit buildings have more dwelling units than individual buildings in the surrounding areas, because the unit sizes are small, even the six-unit buildings have a compatible volume. Accordingly, the proposed PRD meets criterion ' 6.1.10 (a) of the Design Review and Site Plan Review criteria.

Appellee-Applicant requests that the proposed PRD not be subjected to the inclusionary zoning requirements of the Zoning Ordinance, but that if it is necessary to comply with those requirements, Appellee-Applicant proposes that 37 of the units be designated as affordable or inclusionary housing units. Appellee-Applicant requests a waiver of the normal 99-year duration[4] of that requirement, to expire in 2085 when its ground lease expires, and proposes to make a payment of $12,000 into the City= s Housing Trust Fund in recognition of that waiver.

No exemption that could be applicable to the proposed PRD appears in ' 14.1.3, therefore the inclusionary zoning requirements must be met for the proposed PRD. Thirty-seven affordable units would be the requirement if all the units in the project were to be rented, as this project is in a waterfront district. If the units were to be sold, the number of required affordable units would be calculated from Table 14-A in ' 14.1.8 and would not exceed 37 units.

No evidence was presented to suggest that the trustee of the Flynn Estate, which signed the application as landowner, is unable to commit to the remainder of the 99-year duration, at least as long as the buildings are in use for housing. Nor was evidence presented to suggest that the now-16- or 17-year reduction in duration was necessary to make the project feasible. There is therefore no basis in the evidence for a reduction in the 99-year duration of the affordable housing requirement, as the landowner, represented by the trustee of the Flynn Estate, signed the application, thereby committing to its conditions, and there was no evidence that the requested reduction in duration was necessary to make the project feasible. This denial is without prejudice to any showing on this issue that Appellee-Applicant may wish to make in any future application for this property. Appellee-Applicant has not specified which of the units in the proposed PRD are proposed to be designated as affordable or inclusionary units, and has not committed to whether it will rent out those units or sell them in condominium ownership at an affordable price. In addition, while the project is not proposed to be built in phases, it is expected to take approximately 18 months to complete. Appellee-Applicant proposes that the buildings will be occupied as each building is completed and obtains a certificate of occupancy. Appellee-

Applicant has not proposed how the inclusionary units will be designated proportionally to that sequence. We therefore note for the parties= guidance that ' 14.1.13 requires that the inclusionary units be made available on approximately the same schedule as the project= s market units.

In addition to the residential units and garage structures, Appellee-Applicant proposes to construct a community building, a community pool and play area, and the necessary infrastructure for the development, including roadways, parking spaces, water and sewer piping to connect to the municipal systems, and stormwater and drainage structures leading to a bio-retention area, a detention pond and an emergency spillway down to drainage at the southwest corner of the property.

Appellee-Applicant proposes to provide 248 parking spaces[5] for the 148 units, plus 10 spaces for the community building and pool, and therefore is requesting a parking waiver under ' 10.1.19 of 34 spaces. The City conditionally supported the parking waiver request, based upon the relatively small size of the units, the availability of parking on the streets of the proposed PRD as well as in the designated parking spaces, and the potential for extension of the Chittenden County Transportation Authority (CCTA) bus route to or through the proposed PRD. However, as of the date of trial there were no plans to extend the CCTA bus route, and the street width is proposed to be 22 feet, rather than the 30-foot width required by ' 28-7(b)(3)(B) of the Subdivision Regulations, which suggests there would not be sufficient room for on-street parking even on one side of the two-way streets. Therefore, the proposed PRD does not qualify for a parking waiver, until and unless CCTA service is planned to become available by the time the project is constructed, or the street width is adjusted to allow for on-street parking, or additional evidence is presented showing that the relatively small size of the units themselves warrants the parking waiver.

Moreover, ' 28-7(b)(3)(A)(XII) requires the extension of existing streets, such as Nottingham Lane, into a new development, to be at least the same width as the existing street, if not wider. No evidence was presented as to whether a 30-foot-wide street with a sequence of traffic-calming constrictions, such as described in footnote 6, would qualify as a 30-foot-wide street under this section and therefore not require a waiver. If it did not so qualify, a waiver of the street width requirements would be necessary for the streets to be acceptable as designed. Appellee-Applicant does not appear to have obtained a waiver of this requirement, which has to pass both the DRB and the City Council under ' 28-11. Accordingly, neither the parking nor the street width for the proposed PRD can be approved as designed.

Appellee-Applicant proposes to provide sidewalks on both sides of the PRD= s streets, plus an unpaved pathway southerly through the undeveloped area of the project from the community building to Edinborough Park. The pedestrian access, new landscaping (as distinct from the tree retention plan discussed below), the pesticide plan and the lighting and signage proposed by Appellee-Applicant for the PRD all meet the requirements of the City= s Zoning Ordinance and Subdivision Regulations.

Section 28-10 of the Subdivision Regulations requires the streets within the proposed PRD and the upgraded short segment of Starr Farm Road or Sunset Cliff Road to the entrance of the proposed PRD to be dedicated to the City, and requires the developer to commit to that

conveyance. Appellant argues that Keystone lacks this authority, both because it is Eastern Landshares that is the lessee, and because the Flynn Estate has not consented to this condition. At the hearing, Appellee-Applicant adopted the DRB= s conditions as part of the revisions to its application, including that A the streets within the project and Sunset Cliff Road from the Project to Starr Farm Road shall be dedicated and conveyed to the City of Burlington after they are developed/improved. In the event the City condemns said property pursuant to its power of eminent domain, the Appellee-Applicant shall pay the reasonable cost thereof.@ Appellee-Applicant= s willingness to pay for condemnation is not sufficient to meet the requirements of ' 28-10, because condemnation proceedings require a court finding of necessity which may or may not result from the circumstances of this development. However, by signing the original application, the Flynn Estate committed itself to all of the representations made in the application. All that is required to meet ' 28-10 is for the Flynn Estate to sign the revisions to the application, or to sign any future application, as a co-applicant.

The stormwater drainage plan for the project has been designed to direct flow towards the streets and the interior of the project, and thence to a bio-retention area and a detention pond and emergency spillway. It is designed so that the post-development stormwater flow off the property as a whole will be equal to or less than the pre-development flow, and will prevent any undue adverse discharge of stormwater onto neighboring properties, in compliance with ' 6.1.10 (e) of the Design Review and Site Plan Review criteria and ' 28-7(b)(4)(A) of the Subdivision Regulations. However, a potentially adverse effect of the very effectiveness of the drainage system is discussed below with respect to the red maple/skunk cabbage swamp as an outstanding natural feature.

Erosion control during construction is adequately provided for with silt fencing and other erosion control measures, including the sequencing of ground disturbance for the bio-retention area and detention pond.

The proposed PRD is estimated to generate approximately 70 additional vehicle trip ends (one way trips) in the morning peak hour and approximately 85 additional vehicle trip ends in the afternoon peak hour. The intersections potentially affected by this traffic can accommodate the additional trips without a reduction in their level of service. A $15,000 impact fee regarding traffic to be paid by Appellee-Applicant will address traffic-calming measures to be installed related to the traffic from the proposed PRD. In addition, the installation of the roads for the proposed PRD will connect Starr Farm Road with Nottingham Lane and will provide an alternate route for access, including for emergency vehicles, to the Strathmore development. This improvement alone might justify a waiver of the planning standard imposed by ' 28-7(b)(3)(A)(V) of the Subdivision Regulations, that local streets should be designed to discourage use by through traffic. Appellee-Applicant does not appear to have applied for a waiver of this requirement. However, a waiver of this planning standard is not necessary, because the constriction in street width, the S-bend in Nottingham Lane, and the D-shaped design of Scarlet Circle, all function to discourage through traffic, as the speed and convenience of through traffic will be significantly reduced by these design elements. Therefore, the planning standard of by ' 28-7(b)(3)(A)(V) is met by the project design.

The tree retention plans for the areas to be disturbed show all trees at least 10 inches in trunk diameter, but do not show the sizes, species or tree types except for the trees to be retained. Some 435 trees over 10" in diameter are shown on the plans as being removed[7] for the project, many of which are located in the grove of large pine trees in the northeastern quadrant of the project. This quadrant contains much of the site= s upland (non-wetland) area, and it is understandable that the development of the site is concentrated in this area. However ' 28-7(b)(9)[8] of the Subdivision Regulations first requires that the grove of trees A shall be preserved as far as possible by harmonious design,@ and also requires that all types of trees over 10" in diameter be preserved, unless it can be demonstrated A that retention of any such tree is not appropriate.@

Appellee-Applicant= s project engineer described the tree retention plan generally as having been designed to keep existing trees > where practical,= but focused on the three-trees-per-unit requirement of ' 28-7(b)(6), rather than on the tree or grove preservation requirements of ' 28-7(b)(9). Appellee-Applicant did not show that the project itself was designed, in the area of the grove of trees, to preserve the grove of trees > as far as possible.= Appellee-Applicant did not show that any consideration was given to determining the placement or design of any of the buildings or parking areas (or to reducing the number or size of buildings or number of units), so as to preserve the grove of trees in the northeast quadrant of the site, or even so as to avoid having to remove certain of the larger trees within that grove, or to minimize the number or importance, to the grove as a whole, of the specific trees that would have to be removed.

Appellee-Applicant provided an analysis by a forester of the five largest[9] trees, showing that they are not healthy and suffer from ice storm damage. However, even if the retention of those particular five trees is not appropriate, for the remaining 430 trees over 10" in diameter slated for removal, Appellee-Applicant has not demonstrated that retention of any of those trees is A not appropriate,@ as required by ' 28-7(b)(9) of the Subdivision Regulations. Appellee-Applicant has not sought or obtained a waiver of that provision from the DRB and City Council under ' 28-11 of the Subdivision Regulations. Accordingly, neither the overall layout and design of the proposed PRD, nor the tree retention plan, can be approved as designed under ' 28-7(b)(9) of the Subdivision Regulations.

Separate from the issues of the pine grove and the removal of individual trees over 10" in diameter, the site contains another > outstanding natural feature= : the rare and unusual red maple/skunk cabbage swamp community, described above in the discussion of wetlands. This red maple/skunk cabbage swamp must also be preserved as far as possible by harmonious design. ' 28-7(b)(9) of the Subdivision Regulations. Using the wetlands delineation of Ms. O= Brien for the northerly boundary within the site of this outstanding natural feature, it is apparent that some buffer must be designed into the project to protect the northerly edge of that feature from being damaged by the human activities of the project. At least an undisturbed 50-foot buffer is warranted for that purpose. Without further specific evidence supporting a wider buffer at that location, the Court cannot find that a wider buffer is warranted solely due to the significance of the red maple/skunk cabbage swamp as an outstanding natural feature. Thus the design of the proposed PRD in the southerly portion of Scarlet Circle adjacent to the red maple/skunk cabbage swamp cannot be approved under ' 28-7(b)(9) of the Subdivision Regulations, because that outstanding natural feature is not sufficiently preserved by harmonious

design considering the need for a fifty foot buffer from the boundary as delineated by Ms. O= Brien in that area.

Moreover, Appellee-Applicant did not show that the proposed drainage plan for the proposed PRD was harmoniously designed adequately to protect the water flow necessary for the preservation of the outstanding natural feature identified as the red maple/skunk cabbage swamp. The very characteristic that makes that swamp unusual is its sandy, relatively well-drained soil, not otherwise characteristic of a wetland or swamp. It remains a wetland or swamp because of its high water table, due in part to its proximity to the lake, and in part to the pre-development drainage pattern or flow of water through it. Appellee-Applicant= s design for its drainage plan will interrupt that flow for the entire northeast quadrant of the site, and will drain water into the center of the site and into the roadways, from which it will be conducted by piping to the bio-retention area and the retention pond if necessary. Appellee-Applicant adequately showed that the total drainage from the site to areas off site would not be changed or increased as a result of the proposed PRD. Appellee-Applicant also showed that the proposed drainage system would improve the water quality of water draining from the roads and parking areas before that water returns to the natural systems or reaches the lake. But Appellee-Applicant did not show that the interruption of the natural drainage pattern by the drainage system for the proposed PRD would not damage the outstanding natural feature identified as the red maple/skunk cabbage swamp. Accordingly, the design of the proposed drainage system for the northeast quadrant of the site (the Scarlet Circle area) cannot be approved under ' 28-7(b)(9) of the Subdivision Regulations, until or unless Appellee-Applicant shows that it has been harmoniously designed to preserve the outstanding natural feature of the red maple/skunk cabbage swamp.

Based on the foregoing, it is hereby ORDERED and ADJUDGED that the project cannot be approved as designed, and therefore that Appellee-Applicant= s application is DENIED. This denial is without prejudice to any further application addressing the issues discussed in this decision, in particular regarding the layout and design of the project, the tree removal plan, protection of the pine grove, protection of the red maple/skunk cabbage swamp (both with respect to an adequate buffer and with respect to the maintenance of its necessary high water table); engineering of the street to the width required by the ordinance and to accommodate on-street parking, with or without traffic-calming features within the streets, or in the alternative applying for a subdivision waiver for street width; and obtaining a commitment from the landowner regarding dedication of the streets and acceptance of the balance of the 99-year term of the affordable housing requirement. This decision is also without prejudice to any future application for a smaller or differently designed proposal on the property that addresses the requirements of the City= s zoning ordinance and subdivision regulations.

This is a final decision and order disposing of this appeal. Any party wishing a judgment order addressing each section of the applicable zoning and subdivision requirements, in the format of a DRB decision, may circulate such proposed order for form and submit it to the Court.

Done at Barre, Vermont, this 18th day of April, 2003

_____
Merideth Wright
Environmental Judge

---

**Footnotes**

1.    The entity originally filing the appeal was Sunset Cliff, Inc., which may be another name for the Sunset Cliff Homeowners' Association, as it is characterized by its attorneys. Strathmore Homeowners' Association, Inc., failed to enter an appearance after the firm of Langrock, Sperry and Wool moved to withdraw. Also, an Appellant Group consisting of forty individual owners or occupants of property in the vicinity of the project had originally entered an appearance in the case, but withdrew.

2.    The Court makes no findings here on the outcome of an application to the state wetlands program to reclassify the red maple/skunk cabbage swamp or for a determination allow some construction in the northwest quadrant emerging shrub/scrub wetland in return for additional protection of the red maple/skunk cabbage wetland, beyond the level required by the City.

3.    It has this spelling on Appellee-Applicant's engineering drawings, but is spelled Scarlett in Appellee-Applicant's proposed findings.

4.    Appellee-Applicant may therefore request the elimination of its proposed payment of $12,000 to the Housing Trust Fund, which was made in contemplation of this waiver.

5.    No evidence was presented about the location of any additional parking spaces or lots if the waiver were denied; accordingly any such spaces are not before the Court in the present application, even in the alternative.

6.    The traffic-calming benefits of the narrower streets need not be lost with such a redesign, as streets can be designed to include a sequence of constrictions to the narrower width to provide the traffic-calming effect, with on-street parking spaces being made available along the segments of wider street between the constrictions.

7.    Several additional trees are shown as being preserved, but are in locations so close to the construction of underground piping or drainage systems that it is also likely that they would not survive the experience. Appellee-Applicant committed to replacing any of the trees shown as 'to be preserved' that did not survive, but any such replacements would be much smaller than the greater-than-10"-diameter trees to be preserved.

8. Note that this is a separate subsection from §28-7(b)(6) that requires that three trees per unit be planted or preserved on site, and that existing trees may be counted towards that requirement. There is no question that Appellee-Applicant's proposed PRD meets this requirement.

9. It is not clear whether these are the five largest trees on the site, or within the construction area, or the five largest of those slated to be removed. This analysis appears to have been carried out in response to the condition contained in the discussion on page 2 of the City's approval, relating to §6.1.10(b) of the Design Review Criteria.